**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

| | | |
|---|---|---|
| BRIAN C. DAVISON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 1:16-cv-932 |
| | ) | (JCC/IDD) |
| | ) | |
| LOUDOUN COUNTY  BOARD OF | ) | |
| SUPERVISORS and PHYLLIS RANDALL, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS LOUDOUN COUNTY BOARD OF SUPERVISORS AND  PHYLLIS RANDALLS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT FILED PURSUANT TO FED R. CIV. P. 56(a)

COME NOW the defendants, Loudoun County Board of Supervisors ("the Board")[1] and Phyllis Randall ("Randall"), by counsel, and in support of their Motion for Summary Judgment, filed pursuant to Fed. Civ. P. 56(a), argue as follows:

### I.    STATEMENT OF PROCEEDINGS

The plaintiff, Brian Davison ("Davison"), filed his original Complaint against these two defendants as well as other County defendants including  multiple Counts related to alleged violations of his constitutional rights, and a claim under the Virginia Freedom of Information Act ("VFOIA"). Following hearing on all of the defendants' Motion to Dismiss, the court entered an Order on September 9 dismissing Counts III (equal protection claim) and IV (VFOIA), dismissing claims against all of the individually named defendants, including Randall,  and denying the Board's Motion to Dismiss Counts I and II.  (Doc. 11)[2].

---

[1]The Board is the legally recognized  governing body for Loudoun County and therefore "the Board" may be used interchangeably with "Loudoun" or "the County."

[2] "Doc." refers to court ECF numbered document in the case.

The Board filed an Answer to Counts I and II. (Doc. 13). Davison filed a Motion for leave to amend his Complaint to add defendant Randall in her individual and official capacity, identifying Counts V and VI for alleged constitutional rights based on the previously claimed "blocking"[3] of Davison's ability to post to Randall's Facebook page, which she unblocked within 24 hours. (Docs. 14-15; Compl. ¶¶ 28, 33; Am. Compl. ¶¶ 15, Ex. 24; Doc. 6, p. 9). Davison's Motion for leave to amend was objected to, then granted in part, denied in part, by the court on September 30. (Doc. 20). Loudoun filed an Answer to the First Amended Complaint and Randall filed a Motion to Dismiss pursuant to Fed R. Civ. P. 12(b)(6). (Docs. 34 and 35-38, respectively.)

Davison again moved to amend his Complaint by adding a Count VII[4] (Doc. 25) which was denied without prejudice. (Docs. 31-32). Davison moved for partial summary judgment (Docs. 39-41) which was denied, as was Randall's Motion to Dismiss. (Docs. 57-58). Randall filed an Answer to the First Amended Complaint (Doc. 59) denying all allegations and raising the affirmative defense of qualified immunity. Davison moved a third time to amend his Complaint by adding a Count VII and Counts VIII and IX (now restyled as Counts VII and VII in Davison's Second Amended Complaint as to Randall only) to add claims for alleged violation of the Virginia Constitution protection afforded free speech and due process, which was heard on Friday, March 24, 2017. (Docs. 67-69). The motion was granted in part, denied in part, allowing Davison to add the Virginia

---

[3]See Davison's deposition Tr. pp. 59-66 for description of blocking versus banning of an individual, and Davison Tr. Exs. 12 and 13, also Davison's trial exhibits 33 and 36 to which no objection was noted. At times, these terms were used interchangeably in the pleadings and discovery but Randall's action to which Davison objects was actually banning him as opposed to blocking him. Banning prevented him from commenting on her page but not from seeing her page and other posts.

[4]Also the subject of the prior Motion to Amend, which was denied without prejudice. (Doc. 20).

constitutional claims but denying leave to add Count VII which was a variation on the earlier version of Count VII he attempted to include in his lawsuit. (Doc. 87).  An agreed response was filed to that Second Amended Complaint.  (Doc. 94).

Both defendants move for summary judgment pursuant to Fed. R. Civ. P. 56(a) on the following grounds: As to the Board, the uncontested facts, including stipulated admission made by Facebook, prove that neither the Board  nor any County employee, agent, or representative of the County, at any time deleted the Facebook postings complained of by Davison. Therefore, he has suffered no violation of federal (or state) constitutional rights.  As to Randall, the uncontested facts support no violation of Davison's federal or state constitutional rights and, as a matter of law, she is entitled to qualified immunity.  Lastly, Davison has suffered no damages.

## II.    LISTED STATEMENT OF UNDISPUTED FACTS

1.      Davison is a resident of Loudoun, Virginia, who frequently comments publicly on local government matters including those involving the County. Compl. ¶ 1[5]; Davison Tr. pp. 80-84). The Board is the public governmental body responsible for government functions within Loudoun County.  Compl. ¶ 2; Loudoun's Answer Doc. 13, ¶ 3.

2.      Randall is the Chairman of the  Board.  (Am. Compl. ¶¶ 4, 5; Randall's Answer to 1st Am. Compl. ¶ 4).

3.      The Loudoun County Government maintains an official Facebook page which has been verified by Facebook. Verification means that Facebook has determined that the County's

---

[5]Because Davison incorporated allegations from his initial and subsequent Complaints into the most recently filed Second Amended Complaint, citation to those earlier pleadings is as follows: "Compl.," "1st Am. Compl.," "2nd Am. Compl."

Facebook page is authentic, in that it is the official Facebook page for the County.  Barbour  Decl. ¶ 2, Exh. 1.[6]

4.      In 2016, administrative control over the County's official Facebook page was limited to five identified individuals, staff contributors of the County Division of Public Affairs and Communications, who were the only individuals authorized, and with access, to post information and delete or remove comments on the Facebook page through Facebook or the social media tool called Hootsuite (https://hootsuite.com/). These were Glen Barbour ("Barbour"), Robin Geiger ("Geiger"), Nancy McCormick ("McCormick"), Emily Watkins ("Watkins"), Liz Mills ("Mills") and Catherine Motivans ("Motivans").Barbour Decl. ¶ 3, Exh. 2. Catherine Motivans, Accessibility Services Manager, had information allowing her to access the County's Facebook page through Hootsuite, if necessary, while her supervisor Watkins was out of town the week of July 18, however she did not do so and did not remove, hide, delete or otherwise tamper with any of Davison's comments. Motivans Decl. ¶¶ 1, 2.

5.      Barbour, Geiger, McCormick and Watkins are  authorized to make postings or delete information by directly accessing the County's Facebook page or through Hootsuite. The fifth administrator, Liz Mills, who is no longer employed by the County, was authorized to make postings, delete or remove information to the County's Facebook page via Hootsuite.  *Id.* The County Facebook page had a posted Social Media Policy which notifies users of the terms and conditions for the posting of comments, and the administrators' authority to remove and/or delete comments. Barbour Decl. ¶ 4, Ex. 3A.  In November 2016, the policy was updated.  Ex. 3B.

6.      On July 19, 2016, a post was created on the County's Facebook page that read "#Loudoun County Attorney Leo Rogers has determined that text messages sent and receive[sic]

---

[6]Declaration dated April 4, 2017, filed simultaneously herewith.

during a Board of Supervisors committee meeting did not violate the Virginia Freedom of Information Act. http://bit.ly/29JL32Y." The post linked to a press release on Loudoun's website stating that the text messages during the July 15, 2016 committee meeting did not constitute a FOIA violation Compl. ¶ 13; Ex. 15.

     7.     At 4:20 p.m on July 19, 2016, Davison began to making comments under the screen name "Virginia SGP" on Loudoun's Facebook page related to the post quoted in paragraph 6.  His comment, and three others he made in succession that afternoon, were "hidden and/or deleted." Compl. ¶¶ 14-19, Compl. exs. 3-9.

     8.     During the week in which this occurred, including on July 19, 2016 , two of the five Loudoun administrators with authorized access to post and delete or remove comments, Geiger and Watkins,  were out of town and did not access the County's Facebook page at all during that time and neither did Motivans, who worked for Watkins.  Barbour Decl. ¶ 5; Geiger Decl. ¶ 4 ; Watkins Decl. ¶ 4; Motivans Decl. ¶ 2.  The other administrators with authorized access, Barbour, McCormick, and Mills, at no time deleted, hid, or otherwise removed Davison's posted comments of July 19, 2016.  Barbour Decl. ¶¶ 5, 7, 8, 9, 10, 11; McCormick Decl. ¶ 4; Mills Decl. ¶ 4.[7]

     9.     Facebook reviewed the matter and determined that its systems appeared to have deleted the comments without the County's or its employees' involvement.  Davison's comments on the County's Facebook page were neither deleted by the plaintiff nor the defendant or any of its employees.  Exs. 21.[8]

---

[7]Previously submitted in support of the Board's Motion to Dismiss when Mills was still employed by the County.

[8]Parties Joint Stipulation of Facts and attached letter incorporated therein. Doc. 76.

10.     The specific comments may no longer be retrieved by either party within the Facebook system.  No Facebook log records exist regarding the deletion of the specified comments. Facebook's system caused the comments to be deleted from defendant's County Facebook page.  As a direct result of communications by plaintiff and defendant to Facebook and with Facebook's counsel. Facebook has made software changes that it believes will prevent comments from being unintentionally deleted going forward.  Ex. 21.

11.     An individual Board member may request that the County staff create a Board member's sponsored Facebook page, which would then be maintained and controlled by County employees in the Office of Public Affairs and Communications as identified herein above in paragraphs 4 and 5.  To date, none has been created.  Each member of the Board, including Randall, has a County created and assigned email account and there is a general email account providing email access to the entire Board.  Randall's email account is Phyllis.Randall@loudoun.gov; the Board's general email account is BOS@loudoun.gov.  Barbour Decl. ¶¶ 19-20; Randall Decl. ¶ 2.[9]

12.     Randall, personally, created the Facebook page identified by Davison in his First Amended  Complaint,  https://www.facebook.com/pg/chair-Phyllis-J-Randall:1726409590911855/about/?ref=page  internal,  ("Randall's  Facebook  page")  and  she manages and controls that page.  She has both a County issued and personal cell phones.  All postings to her Facebook page are made from her personal cell phone device.  She does not post information or communicate via this Facebook page by use of any County computers or devices. Randall Decl. ¶¶ 3-4; Barbour Decl. ¶ 21.

---

[9]Randall's declaration dated April 4, 2017, filed simultaneously herewith.

6

13.     The only other person who has posted information to Randall's Facebook page, on an infrequent basis, is her chief of staff, Jeanine Arnett.  Ms. Arnett has posted photographs or information at Randall's request and has done so only when she was given Randall's personal cell phone to do so.  These instances have occurred when they were together at events, usually on weekends or evenings. Randall Decl. ¶ 5. When she leaves office, her Facebook page will continue to be owned, operated and controlled by her and not pass to any successor or to the County.  *Id.* ¶ 4.

14.     Randall's Facebook page was not created by, and is not owned or operated by, County employees.  No County employees in the Public Affairs and Communications Office have any administrative access or control over Randall's Facebook page. Only Randall and Ms. Arnett have administrative access or control over this Facebook page. The County's Social Media Policy does not apply to Board members of their staff.  Barbour Decl. ¶ 21; Randall Decl. ¶ 4.  Randall has "complete discretion on the operation of her 'official' Facebook page. . . ." Am. Compl. ¶ 11.

15.     Davison cannot recall posting anything on Randall's Facebook page in the three months before February 3, 2016, after she was elected Board chair. Davison Tr. pp. 5-8.

16.     In February 2016, Davison became aware of an educational meeting to be held at the Town Hall where members of the Board and School Board members appeared on February 3, 2016. Davison Tr. pp. 8-9.  He posted a comment on the Facebook page for Loudoun Educational Alliance for Parents ("LEAP") and tagged Randall stating that, since there was a big discussion of ethics in Loudoun County after Randall was elected and she ran on that platform, there were ethical issues involving multiple members of the School Board whose spouses worked for the school system and he included criticism of the School Board chairman.  Davison Tr. p. 9, Tr. Ex. 4.

7

17.     Because he tagged Randall, she would have received an email that indicated someone commented about her.  Davison Tr. p. 10.  The February 3, 2016, Town Hall meeting was held at the School Board Administration building.  Randall was among those attending, but not all of the Board members were present, and members of the School Board attended.  Davison Tr. p. 11. Questions were solicited from those in attendance, submitted in writing, and then individuals would randomly select questions to be addressed directly to a particular individual.  Davison Tr. pp. 12 -13.

18.     The question submitted by Davison, which was selected and directed to Randall at the Town Hall meeting on February 3, asked whether she was advocating an ethics pledge for the School Board, inasmuch as she ran for the Board of Supervisors on an ethics pledge and was working on passing such a pledge, given that the chair of the School Board works for a private foundation of a for profit charter school billionaire.  Davison Tr. pp. 21-22.

19.     Davison was dissatisfied with her response at the Town Hall meeting and posted his negative thoughts about her response on Facebook, including the LEAP organization's page and Loudoun Times Mirror, and sent Twitter comments to Randall.  Davison Tr. pp. 20-23, Ex. 18, pp. 23-24; Exs. 25-27.[10]   Davison did not attempt to comment on Randall's Facebook page during the meeting.  Davison Tr. pp. 23-24.

20.     On or about February 1, 2016, Davison  became aware of a posting made by Randall to her Facebook page related to a recent visit to the County by Senator Tim Kaine.  Davison Tr. pp. 15, 19-20.  Davison felt "particularly aggrieved" about Senator Kaine, not because Randall hosted him, but because he believes that Senator Kaine is unethical in terms of the education policy in Virginia, as he is married to the former Secretary of Education whom Davison believes "defrauded

---

[10]These exhibits were also identified for trial by Davison in his final pretrial disclosures with no objection filed by the defendants.

the federal government on the use of value added data in Virginia. . . . and under the waivers of the No Child Left Behind."  Davison Tr. p. 19, Tr. ex. 7.

21.      Davison does not recall whether Randall posted anything related to the Town Hall meeting or the ethics pledge on February 3, 2016, or later.  Davison Tr. pp. 31-33.  He intended to post comments about the meeting and the ethics pledge after he arrived home following the meeting. *Id.* Davison also intended to post a comment on Randall's Facebook page in response to her February 1, 2016 posting about Senator Kaine. That comment was ultimately posted on February 6, 2016. Davison Tr. pp. 29-30, Tr. ex. 7.

22.      Randall posted a few photos and a brief statement about the Town Hall meeting on her Facebook page that evening.  In response, Davison posted what Randall felt was a tirade about the School Board, School Board members, their spouses, and the School Board's ability to be fair. Randall deleted the entire post and banned him because she was concerned about the effect his comments would have on others interested in her Facebook page. Randall Decl. ¶ 9. Being banned from Randall's Facebook page only precluded Davison from commenting on her page but not from viewing her page.  Davison Tr. p. 30.   It also did not preclude Davison from sharing the information shown on her page with other people by clicking the share button.  Davison Tr. pp. 30-31.

23.      Davison does not recall sharing any information from Randall's Facebook page after he discovered that he was banned.  Davison pp. 31-32.  Randall decided to restore Davison's ability to post comments in response to information posted on her Facebook page the next morning, February 4, 2016, which she did.  Randall Decl. ¶ 9.

24.     When Davison looked at Randall's Facebook page on the morning of February 4, 2016, the most recently posted topic for discussion shown on her page dealt with Senator Kaine's visit to the County. Davison Tr. pp. 33-34 Tr. ex. 4, p. 2. At that time, he was still banned, although he cannot recall at what time he checked. Although he intended became aware by no later than 5:36 p.m. on February 4 that he was no longer banned, he waited until February 6, 2016, to post a about Senator Kaine's visit. *Id.* at pp. 34-35, Tr. exs. 4-5, 7.

25.     Davison posted a message to Supervisor Buona on his Facebook page or tagged him on Davison's SGP Facebook page; sent emails to individual members of the Board and the entire Board during the night of February 3, 2016; and also posted on the <u>Loudoun Times Mirror</u> Facebook page; as well as multiple postings on his own SGP Facebook page, that he was banned from Randall's Facebook page. *Id.* at pp. 35-36, 49-50. Davison posted comments explaining his frustration with Randall on his own SGP Facebook page, tagged her in these postings so that she would receive notification of the postings. *Id.* at pp. 36-37, Tr. exs. 4, 5, 6; Compl. ex. 19.

26.     At some point, Davison became aware that Facebook software allowed other members of the public, whether known or unknown to him, to prevent him from seeing <u>their</u> posted comments to any public Facebook page, including Randall's. Davison Tr. pp. 38-41, Tr. ex. 20.

27.     Facebook also has settings which allow a Facebook page account holder to limit the ability of third persons to comment independently of information posted or commented upon by the Facebook page holder. It allows the individual owner or creator of the Facebook page to control whether other people can create their own posts on that person's page. Davison Tr. pp. 52-56. Randall controlled postings on her Facebook page by limiting the ability of comments from third parties to only comment on posts that she posted on the page, allowing her to control the subject matter. Davison Tr. pp. 53-56, Tr. ex. 24.

28.     On April 30, 2016 at 10:01 a.m., Davison posted a comment in reply to other posted comments stating that the County Attorney told Randall she could not block him, to which she responded at 10:28 a.m. that she never had a conversation with the County Attorney or anyone in his office about blocking Davison.  She stated that the block (ban) lasted for about twelve hours and she decided that blocking (banning) him was not correct and not the type of leader she wished to be. Davison Tr. pp. 64-65, Tr. ex. 9; Randall Decl. ¶¶ 9-10.  Davison did not see this post made on April 30, 2016 by Randall for months because she did not tag him and he did not routinely go to her Facebook page. Davison Tr. pp. 66-71.

29.     The only time period during which Davison was banned from Randall's Facebook page was at night on February 3, 2016 into February 4, 2016.  During that time, Davison cannot recall whether he shared any comments he saw others making or posting on Randall's Facebook page and has no recollection of anything she posted during the time he was banned.  Davison Tr. pp. 94-95.

30.     Since communicating with Facebook's attorney and receipt of confirmation that Facebook's system deleted the postings about which he complained of against the Board, and being told that Facebook had taken appropriate measures to fix the problem, Davison has not experienced the disappearance of any of his comments or postings to the County's Facebook page.  Davison Tr. pp. 118-20.

31.     On December 2, 2016, Davison submitted a request under the Virginia Freedom of Information Act ("FOIA") to Leo Rogers, the County Attorney, requesting records related to Randall's Facebook page.  He requested records of all County employees who have administrative rights (or editing rights) for this page, any records that show which members of Randall's staff can edit/manage the page.  In response to that request, the County Attorney replied that the information

he requested "is not contained in any public record held by Loudoun County."  "You are seeking information about Phyllis Randall's private Facebook page."  Davison Tr. pp. 125-26, Tr. ex. 21.

32.    Davison is seeking no monetary damages in this case "other than court costs and fees involved in the litigation (e.g. transcripts, process server)." Davison Tr. pp. 5-6, Tr. exs. 1 and 1B[11], interrogatories nos. 1 and 2.

### III.    LAW AND ARGUMENT

### A.    <u>Standard of Review</u>

Summary judgment is proper in this case because there is no "genuine issue" with regard to any material facts related to the Board's entitlement to dismissal based on the undisputed evidence that no County involved employee or action caused the disappearance of Davison's July 2016 postings which are the subject of his claims against the County and/or the Board.  Accordingly, he suffered no violation of his constitutional rights.  Based on the undisputed facts, Randall's Facebook page was not owned, operated or created by the County government, did not constitute a recognized public forum, she did not violate Davison's constitutional rights, and she is entitled  to qualified immunity.  Fed. R. Civ. P. 5(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Apps. & Serv. Co.,* 80 F.3d 954, 958-59 (4th Cir. 1996); *Thompson Everett Inc., v.  National Cable ADV*, 57 F.3d 1317 (4th Cir. 1995).

 A party seeking summary judgment has the initial burden of showing the absence of a material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  A genuine issue of material fact exists, "if the evidence is such that a reasonable jury [fact finder] could return a verdict for the non-

---

[11]Ex. 1 is Davison's sworn answers to defendants' interrogatories which he authenticated at deposition; Ex. 1B is copy of defendants' written interrogatory requests because Ex. 1 does not contain the interrogatory questions, only Davison's written responses.

moving party." *Anderson,* 477 U.S. at 248. Any disputed facts must be material, " . . . to an issue

necessary for the proper resolution of the case, and the quality and quantity of the evidence offered

to create a question of fact must be adequate to support a jury verdict." *Thompson Everett Inc.,* F.3d

at 1323, citing *Anderson,* 477 U.S. at 252.  Although, at the summary judgment stage, the facts must

be viewed in the light most favorable to the nonmoving party, "'[w]here the record taken as a whole

could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

trial.'" *Scott v. Harris,* 550 U.S. 372, 380 (2007).

**B.    Davison's First and Fourteenth Amendment Claims against Loudoun County should be dismissed with prejudice**.

Davison's constitutional claims against the Board are based on the allegations that four

posted comments he made to the County's Facebook page on July 19, 2016, were hidden or deleted

by "the page's moderator" or someone under the direction and control of the Board. Compl. ¶¶ 15-

19.  In denying the Board's initial Motion to Dismiss this court stated that, because Davison alleged

that the Board ratified a decision of a subordinate in deleting his Facebook postings, the case against

the County was a "close" factual question, "and so properly addressed after some discovery has

taken place." Doc. 11, pp. 13-14.

Discovery in the case revealed the undisputed fact that neither the Board nor any County

employee, official, or officer, had anything to do with the deletion of Davison's July 2016 postings

on the County's Facebook page.  Ex. 21.  Facebook has acknowledged that "its systems appeared

to have deleted the comments without Defendants' involvement." *Id.*  The parties have stipulated

to this and also stipulated to the fact that Facebook has since made software changes which it

believes will prevent comments from being unintentionally deleted going forward. *Id.*  The parties

have stipulated to the fact that Davison's comments on the "'Loudoun County Government'

Facebook page's July 19, 2016 postings regarding potential FOIA violations were neither deleted

by Plaintiff nor Defendant, or its employees." Davison has incurred no damages.  Davison Tr. pp.

5, 6, 30-37.  Accordingly, Counts I and II of the Complaint (incorporated into plaintiff's subsequent

Complaints,  including the Second Amended Complaint now before the court) should be dismissed

with prejudice.

### C.    Davison's First and Fourteenth Amendment, and Virginia Constitutional, Claims against Randall should be dismissed with prejudice

Based on the undisputed facts, Randall's Facebook page, which was created and controlled

by her personally and is not subject to control or administration by the County or subject to its social

media policy, is not a public forum. Randall Decl. ¶¶ 3-5; Barbour Decl.  ¶¶ 19, 21.  Davison's

statements or arguments  that Randall's Facebook page is "official," are conclusory.  Just because

she happens to be the Board chair, an elected official of a governing body which governs not through

individuals but collectively, does not mean that her Facebook page is a public forum, limited or

otherwise.  Davison has also incurred no damages as a result of being temporarily banned from

Randall's Facebook page.

It is undisputed that individual Board members do not have the power and authority to

officially act and bind the entity or any other County department or agency, and the powers of the

Board and any afforded the Chairman are set by statute. Virginia Code §§ 15.2-800, *et seq.*. The

governing body acts as a whole or by quorum.  Va. Code §§ 15.2-400, *et seq.* This is true even

though her Facebook page identifies her as "Chair," and includes the words "Government Official,"

Davison's Compl.  ex. 18.  Randall's personal Facebook page, unlike the County's Facebook page,

is also not a Facebook account page verified as a governmental or organizational page.  Exs. 3, 4,

18. This is further supported by the fact that the County has no involvement in the management,

14

control, or operation of her personal Facebook page, and she has not elected to have a County controlled Facebook page. Whether a public meeting of the Board occurs is also governed by statute. Va. Code § 2.2-3701.[12] Under these provisions, it is clear that Randall's Facebook page, her postings, and the posting of comments by individuals in response to her postings, are not equivalent to a Board meeting which is the only capacity in which Randall officially acts in the actual or transaction of government business or effectuation of governmental policy.

The County's Facebook page, as distinguished from Randall's, is a limited public forum as Davison concedes (Compl. ¶ 30), and the County had the right to reserve the page for "its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 46 ((1983)(citing *U.S. Postal Serv. v. Greenburgh Civic Ass'ns,* 453 U.S. 114, 131 (n.7 (1981)). Limited public forums may lawfully be created and designated for "a limited purpose such as use by certain groups, . . . or for the discussion of certain subjects." *Perry,* 460 U.S. at 46 n. 7. During the time period in question, the County could, and did, impose limitations on content-based subject matter and preserved them once

---

[12] "Meeting" or "meetings" means the meetings including work sessions, when sitting physically, or through telephonic or video equipment pursuant to § 1. 2.2-3708 or 2.2-3708.1, as a body or entity, or as an informal assemblage of (i) as many as three members or (ii) a quorum, if less than three, of the constituent membership, wherever held, with or without minutes being taken, whether or not votes are cast, of any public body. Neither the gathering of employees of a public body nor the gathering or attendance of two or more members of a public body (i) at any place or function where no part of the purpose of such gathering or attendance is the discussion or transaction of any public business, and such gathering or attendance was not called or prearranged with any purpose of discussing or transacting any business of the public body, or (ii) at a public forum, candidate appearance, or debate, the purpose of which is to inform the electorate and not to transact public business or to hold discussions relating to the transaction of public business, even though the performance of the members individually or collectively in the conduct of public business may be a topic of discussion or debate at such public meeting, shall be deemed a "meeting" subject to the provisions of this chapter.

established. *Perry,* 460 U.S. at 46; See, Lyrissa Lidsky, *Public Forum 2.0,* 91 B. U. L. Rev. 1975, 1984 (2011); Barbour Decl. ¶ 4; Exs. 3A, 3B.

Public forums are defined by "the historical use of government property.*" Id.* at 1983 (citing *Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 680 (1992). "A designated public forum may be made available 'for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects.'" *Sons of Confederate Veterans v. City of Lexington,* 722 F.3d 224, 230 (4th Cir. 2013). There must be a "clear indication of government intent" by the County or the Board–the legally recognized governmental entity-to designate a Facebook page as a public forum, limited or otherwise. *Id.* at 1984 (citing *Cornelius v. NAACP Legal Def. and Educ. Fund,* 473 U.S. 788, 803-03 (1984)). The County can lawfully limit the stated purpose or designation of its Facebook page, stating that it does not intend to create a traditional open public forum and retain the ability to eliminate or edit comments. *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 270 (1988). A non-public forum is defined as property owned or controlled by the government, "which is not by tradition or designation a forum for public communication." *Perry,* 460 U.S. at 46. In determining government intent to create a public forum, the courts look "to the policy and practice of the government to ascertain whether it intended to designate a place traditionally open to assembly and debate as a public forum." *Cornelius,* 473 U.S. at 803.

With regard to Randall's Facebook page, the undisputed facts show that it was not created by the County government and is not owned, managed, operated or controlled by the County government.   Accordingly, there was and is no intent by the actual government to create and designate Randall's Facebook page as any type of public or non-public forum.  Further, Facebook social media is "neither owned nor exclusively controlled by" the individual or even a governmental

Facebook account holder. Facebook is the holder of proprietary software and issues licenses to account holders but retains control of Facebook page content by imposing specific terms and conditions. *Public Forum 2.0,* at 1996; Davison Tr. exs. 12-13. As conceded by Davison, due to Facebook's internal software, anyone can mark his postings as spam which would cause Facebook to suppress his comments, without any action taken by the government or any governmental employee. Davison Tr. pp. 121-22.

It is Facebook's created software which allows this to occur and to which Davison objects, arguing that it restricts his ability to have full access to Randall's Facebook page, not in order to petition or communicate with her, but because he can neither see nor comment on postings made by other individuals. *Id.* Finally, Facebook makes it almost impossible to view someone's Facebook page, such as Randall's, without creating a Facebook account and becoming a Facebook member. Davison Tr. pp. 46-47. Thus, Randall's Facebook page, in addition to not being "operated by the Government. . . ." it is not freely accessible to members of the public. *Greer v. Spock,* 424 U.S. 828, 836 (1976)("The guarantees of the *First Amendment* have never meant 'that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please.")(citing, *Adderley v. Florida,* 385 U.S. 39, 48 (1966)).

Davison concedes that Randall has "complete discretion" in the operation of her Facebook page, thus her page is not a recognized public forum under any existing case law or statute. It does not even constitute a non-public forum under *Perry* because it is not "owned or controlled by the government," i.e. the Board, which is the official governing body for the County. *Perry,* 460 U.S. at 46. Simply allocating a total amount of funds for operation of Randall's office as chair and the employment of staff, where the uncontested facts show that she used a personal device to make

postings and, her chief of staff occasionally made postings on evenings or weekends, and given that her elected position, by statute, confers no independent policy making authority, does not convert her Facebook page into a public forum.

Randall is not a constitutional officer holder with independent legislative or policy making authority, such as Virginia's Attorney General or the Commonwealth's Attorney, James Plowman ("Mr. Plowman")[13], as argued by Davison. Government employees and elected members of a policy making legislative body do not give up the right to communicate via social media, whether through a Facebook page identifying them by name with no privacy protections, or Facebook page they created identifying them by name and including their elected title with no privacy protections. Under Davison's theory, elected officials or government employees could not create Facebook pages with privacy protections if they include any information on that page identifying their employment status or elected position. More importantly, the fact that Facebook controls posted material, access to that material, provides the means by which other people can preclude Davison from seeing their posts and commenting on them, all through legally licensed software, demonstrates the limited circumstances under which even an acknowledged "official" Facebook page can be deemed a governmental public forum, limited or otherwise.

Davison has ample opportunities and means by which, even he admits, to communicate in public about matters of interest to him, including criticism of Randall and many other people. These include the County's Facebook page; various newspapers' Facebook pages; his own Facebook page; other web-sites; emails to County employees. He is not claiming that his right to petition the government (in this case Randall or the Board) was denied or interfered with. The resources

---

[13]"*Plowman*" when referring to case no. 1:16cv180 (Davison v. James Plowman).

available to him to let his opinions be known to the County government are numerous. However, Davison possesses no constitutional right to <u>force</u> the government, and certainly not an individually elected official like Randall, to listen to him or provide him  access to her Facebook  page. *Minn. State Bd. for Community Colleges v. Knight,* 465 U.S. 271, 283 (1984)(there is "no constitutional right to force the government to listen to [one's] views").  "[T]he mere fact that an instrumentality is used for the communication of ideas does not make a public forum. . . . ." *Perry,* 420 U.S. at 49 (citations omitted).

Even if Randall were a constitutional officer with official policy making powers independent of the Board, at most Davison suffered a *"de minimis* inconvenience" to his exercise of First Amendment rights by being banned from her Facebook page for less than 24 hours. *Balt. Sun. Co. v. Erlich,* 437 F.3d 410, 416, 418 (2006)(no actionable claim for retaliation in violation of First Amendment rights when "a government official denies a reporter access to discretionarily afforded information or refuses to answer questions.") Randall did no more, in fact less, than the Maryland governor  in this cited case.  She very briefly denied Davison the ability to post on her Facebook page–she did not deny him access to information she posted, or his ability to share that information with others.

Davison also fails to state a claim for violation of his Fourteenth Amendment rights. As noted by the court in document 11 (Memorandum Opinion dated September 14, 2016), the Supreme Court has "on occasion held that opportunity for a fair adversary hearing must precede" action that would "directly impinge upon interests in free speech," citing *Bd of Regents of State Colleges v. Roth,* 408 U.S. 564, 576 n. 14 (1972).  In the present case, however, the County government, the Board, did not "directly impinge upon" Davison's "interests in free speech. . . ." *Id.* at 575 n. 14.  Further,  prior hearing/notice is not required in every instance where someone claims violation of free speech rights.

*Mathews v. Eldridge,* 424 U.S. 319, 334 (1976)("[D]ue process is flexible and calls for such procedural protections as the particular situation demands.")(citation omitted).

Under the three-factor test set forth in *Mathews[14]*, Davison's alleged deprivation was a *de minimis* inconvenience to the exercise of any First Amendment rights.  He did not suffer a significant deprivation of any liberty interest.  The Supreme Court has made a distinction between cases in which  there were prior restraints in the form of an injunction on free speech rights or large scale seizure and destruction of books in violation of the First Amendment as opposed to facts such as raised in this case where no such action occurred.  *Id.,* citing *Carroll v. Princess Anne,* 393 U.S. 175, 180 (1968) and *A Quantity of Books v. Kansas,* 378 U.S. 717, 210 (1964).  No similar restraint occurred in this case.  Just as in *Plowman*, Davison "could and did avail himself of Facebook and other social media platforms to reach his audience," and there is no evidence that the multiple "alternative channels of communication" readily available to and used by Davison were "inadequate."  *Plowman* Doc. 42, p. 21.[15]

For the reasons argued herein above in support of the dismissal of Davison's Federal constitutional claims, Randall argues the state constitutional claims should also be dismissed.  *York v. Danville,* 207 Va. 665, 669 (1967)("While the rights of freedom of speech and assembly are fundamental, they are not absolute and must be exercised in subordination to the general comfort and convenience and in consonance with peace, good order and the rights of others.") Although the facts in *York* may be distinguished from the facts in this case, the principle is the same.  Randall also has fundamental constitutional rights, including the right to personally create a Facebook page and

---

[14]424 U.S. at 334-35.

[15]*Brian Davison v. James Plowman, in his official capacity as Attorney for Loudoun County, Virginia, and individually,* Case No. 1:16-cv-180, Doc. 42.

convey ideas and information to constituents which does not involve the transaction of government business as a Board member. She's merely sending out information via Facebook about multiple subjects, including the weather. Davison Tr. ex. 23.

### C. Randall's Entitlement to Qualified Immunity

In addition to not having violated Davison's constitutional rights under either the First or Fourteenth Amendments, Randall is entitled to qualified immunity. "Qualified immunity shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983, insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 306 (4th Cir. 2006) (internal quotation marks omitted). Government officials are entitled to the defense of qualified immunity when sued in their individual capacities unless, "(1) the allegations underlying the claim, if true, substantiate the violation of a federal statutory or constitutional right; and (2) this violation was of a 'clearly established' right 'of which a reasonable person would have known.'" *Id.* The defense of qualified immunity is available to a defendant whose actions are found to be unconstitutional. *Saucier v. Katz*, 533 U.S. 194, 206 (2001).

If there is no violation of a constitutional right, then the defense of qualified immunity is not necessary or implicated. *Id.* at 201. The test is one of objective reasonableness, meaning, "[i]f officers of reasonable competence could disagree on [the] issue, immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The defense provides for protection to all but the plainly incompetent or those who knowingly violate the law." *Id.* The relevant factual inquiry is whether a reasonable chairman could believe that her conduct was lawful. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). The analysis involves "a more particularized inquiry, focusing on whether a

reasonable" County Board Chairman, at the time of the acts or actions complained of, "'could have believed'" her conduct was lawful, "in light of clearly established law and the information" she possessed at the time. *Cruey v. Huff,* 2010 U.S. Dist. LEXIS 118374 *20 (W.D. Va. Nov. 8, 2010); *Collinson,* 895 F.2d at 998 ("assessment whether a 'reasonable person' in the official's position would have known that his conduct would violate 'clearly established' rights must be made on the basis of information actually possessed at the time by the official.")

Based on this court's recent ruling in *Plowman* and the reasons cited for holding that Mr. Plowman was entitled to qualified immunity in defense of Davison's claim that he was banned from Mr. Plowman's Facebook page,[16]  Randall should be entitled to qualified immunity.  As supported by the undisputed facts,  based on Davison's deposition testimony, the allegations in his pleadings, and the exhibits submitted in support of  defendants' Motion for Summary Judgment, during the short amount of time Davison was banned from Randall's Facebook page, he was able to and did use other adequate alternative means of communication channels  including multiple social media sites and email to "reach his audience." *Plowman,* Memorandum, ECF Doc. 42, p. 21.

Just as in *Plowman*, Davison remained able to view Randall's posts, share them with others, and respond to posts through other multiple alternative channels of communication available to him. *Id.*  In addition, just as in *Plowman*, Davison's primary interest in Randall's page was "as a platform to air his grievances against" her and the Loudoun County Public Schools (School Board).  *Id.* at 22. Existing case law did not put Randall on notice that she would be violating Davison's First Amendment right to Free Speech by banning him from her Facebook page on February 3/4, 2016. *Id.* at p. 19.

---

[16]Which ban was in effect for several months, as opposed to less than 24 hours.

If Randall's Facebook page was a "government" page constituting a public forum, then she should be entitled to sovereign immunity in defense of Davison's state constitutional claims under the four factor test established by the Supreme Court of Virginia in *Messina v. Burden,* 228 Va. 301, 311-12 (1984). These factors are: 1) nature of the function performed; 2) extent of the state's interest and involvement in the function; 3) the degree of control and direction exercised by the state over the employee; 4) whether the act complained of involved the use of judgment and discretion. However, analysis of this four factor test clearly reveals that Randall, other than exercising judgment and discretion, was not acting as or on behalf of the government with regard to the management of her Facebook page and the action complained of. Therefore, she could not have violated Davison's constitutional rights.

## IV.    CONCLUSION

WHEREFORE, for the foregoing reasons, and for any additional reasons to be argued at hearing of this matter, defendants move the court for summary judgment in their favor and dismissal of all claims with prejudice. [17]

**LOUDOUN COUNTY BOARD OF SUPERVISORS AND PHYLLIS RANDALL**

By Counsel

---

[17]Required *Rosoboro* notice under Local Rule 11(b) is included in defendants' Motion for Summary Judgment, filed simultaneously herewith.

_____/s/_____

Julia B. Judkins, VSB No. 22597
Heather K. Bardot, VSB No. 37269
Martin Schubert, VSB No. 80904
BANCROFT, McGAVIN, HORVATH & JUDKINS, P.C.
9990 Fairfax Boulevard, Suite 400
Fairfax, Virginia 22030
Telephone:     (703) 385-1000
Facsimile:     (703) 385-1555
jjudkins@bmhjlaw.com
hbardot@bmhjlaw.com
ccarre@bmhjlaw.com
*Counsel for Defendants*

_____/s/_____

Leo P. Rogers, VSB No. 28906
County Attorney, Loudoun County
1 Harrison Street, S.E.
P.O. Box 7000
Leesburg Virginia 20177
Telephone:     (703) 777-0307
Facsimile:     (703)771-5025
Leo.Rogers@loudoun.gov
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of April, 2017, I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system, and emailed and mailed copy to the plaintiff who is pro se, with accompanying *Roseboro* Notice as set forth in the Motion for Summary Judgment, as follows: Mr. Brian C. Davison, 43724 Stone Fence Terrace, Leesburg, VA 20176, bcdavison@hotmail.com.

_____/s/_____

Julia B. Judkins, VSB No. 22597
BANCROFT, McGAVIN, HORVATH
  & JUDKINS, P.C.
9990 Fairfax Boulevard, Suite 400
Fairfax, Virginia 22030
Telephone:     (703) 385-1000
Facsimile:     (703) 385-1555
jjudkins@bmhjlaw.com
*Counsel for Defendant Randall*

24