IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| BRIAN C. DAVISON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    1:16cv932 (JCC/IDD) |
| | ) |
| LOUDOUN COUNTY BOARD OF | ) |
| SUPERVISORS, et al., | ) |
| | ) |
| Defendants. | ) |

## M E M O R A N D U M   O F   D E C I S I O N

This case raises important questions about the
constitutional limitations applicable to social media accounts
maintained by elected officials.  Plaintiff *pro se* Brian C.
Davison brings suit against Defendant Phyllis J. Randall, Chair
of the Loudoun County Board of Supervisors, under 42 U.S.C.
§ 1983.  Plaintiff's claims stem from an incident during which
Defendant banned him from her Facebook page – titled "Chair
Phyllis J. Randall" – for a period of roughly 12 hours.
Plaintiff alleges that this violated his rights to free speech
and due process under the United States and Virginia
Constitutions.  A bench trial was held on May 16, 2017, and the
Court took the matter under advisement.

The Court makes the following findings of fact and,
for the reasons set forth below, concludes that: (1) Defendant

acted under color of state law in maintaining her "Chair Phyllis J. Randall" Facebook page and banning Plaintiff from that page; (2) Defendant's actions, while relatively inconsequential as a practical matter, did in fact violate Plaintiff's right of free speech under the First Amendment to the United States Constitution and Article I, § 12 of the Constitution of Virginia; (3) Defendant did not violate Plaintiff's due process rights under the Fourteenth Amendment to the United States Constitution or Article I, § 11 of the Constitution of Virginia; (4) injunctive relief is not warranted; but (5) a declaratory judgment clarifying that Defendant's "Chair Phyllis J. Randall" Facebook page operates as a forum for speech under the First Amendment to the U.S. Constitution and Article I, § 12 of the Virginia Constitution is appropriate under the circumstances.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. Findings of Relevant Fact

1. Plaintiff is a resident of Loudoun County, Virginia. Tr. 16.

2. Plaintiff is active in local politics, and has a particular interest in what he believes to be corruption on the part of Loudoun County's school board.  Tr. 17-19.

3. Defendant is Chair of the Loudoun County Board of Supervisors – the local governing body of Loudoun County. Tr. 68.  Defendant was elected to a four-year term in

November of 2015 and took office January 1, 2016.  Tr. 68.
Her duties, as she sees them, include communicating with
her constituents.  Defendant's duties do not specifically
require her to maintain a website for that purpose.
Tr. 185.

4.  Defendant is paid a salary by the County, and her position
as Chair is the only job she holds.  Tr. 72.

5.  Defendant's office is provided a budget by the County that
Defendant may spend at her discretion, and from which
Defendant pays the staff she hires.  Tr. 72-73.

6.  Defendant's staff includes Jeanine Arnett, Defendant's
Chief of Staff.  Tr. 73.  Ms. Arnett's duties entail
generally "support[ing] the Office of Chair."  Tr. 181.
This sometimes requires Ms. Arnett to attend events with
Defendant after hours.  Tr. 181, 217, 227.

7.  Ms. Arnett and Defendant share a personal friendship that
predates their professional relationship.  They remain
friends outside of work.  Tr. 177, 224.

8.  Defendant maintains a Facebook page titled "Chair Phyllis
J. Randall," over which she exerts plenary control.  Tr.
82, 84.

9.  Facebook is a popular social media website, *see Packingham
v. North Carolina*, 137 S. Ct. 1730, 1735 (U.S. 2017), that,
as relevant here, permits public figures to create "pages"

through which they may interact with the interested public. *See* Pl. Exh. 38.

10. Defendant created her "Chair Phyllis J. Randall" Facebook page in collaboration with Ms. Arnett on December 30, 2015 – the day before she was sworn into office.  Tr. 133, 176. Defendant then posted on the "Friends of Phyllis Randall" Facebook page, which she had employed during her campaign, and asked that people "visit [her] County Facebook Page[,] Chair Phyllis J. Randall."  Pl. Exh. 221.

11. Both Defendant and Ms. Arnett are designated as administrators of the "Chair Phyllis J. Randall" Facebook page, meaning that both have the ability to post to the page and edit its contents.  *See* Tr. 85, 109; Pl. Exh. 93.

12. Defendant's avowed purpose in creating the Facebook page is to address County residents.  Tr. 176.  She generally uses the Facebook page to share information of interest with the County she serves.  Tr. 196.

13. Defendant purposely created her Facebook page outside of the County's official channels so as not to be constrained by the policies applicable to County social media websites. The "Chair Phyllis J. Randall" Facebook page will not revert to the County when Defendant leaves office, and she will retain control of that page.  Tr. 175, 183.

4

14. Neither Defendant nor Ms. Arnett use County-issued electronic devices to post to or otherwise manage the "Chair Phyllis J. Randall" Facebook page.  Rather, both use personal devices to do so.  Tr. 112, 114, 179-81.

15. Generally, Defendant is entirely responsible for posting to the "Chair Phyllis J. Randall" Facebook page.  On occasion, Ms. Arnett will take pictures of Defendant at events and forward them to Defendant to posts to the page.  Tr. 110-11.  Ms. Arnett has, on at least one occasion, personally posted a picture taken by her or another to the page.  Pl. Exh. 191.  On at least one other occasion, Defendant has taken pictures and sent them to Ms. Arnett to post to the page.  Tr. 180.

16. In the "About" section of Defendant's "Chair Phyllis J. Randall" Facebook page, the page is categorized as that of a "Government Official."  This section of the page further provides as contact information the telephone number of Defendant's County office and her County email address, and includes the web address for Defendant's official County website.  Tr. 129-31.

17. Many of Defendant's posts to her "Chair Phyllis J. Randall" Facebook page relate to her work as Chair of the Loudoun County Board of Supervisors.

18. In one such post, Defendant designates her "Chair Phyllis J. Randall" Facebook page as a channel through which her constituents are directed to contact her:

> Everyone, could you do me a favor.  I really want to hear from ANY Loudoun citizen on ANY issues, request, criticism, compliment, or just your thoughts.  However, I really try to keep back and forth conversations (as opposed to one time information items such as road closures) on my county Facebook page (Chair Phyllis J. Randall) or County email (Phllis.randall@loudoun.gov).  Having back and forth constituent conversations are Foiable (FOIA) so if you could reach out to me on these mediums that would be appreciated.  Thanks much, Phyllis

Pl. Exhs. 201, 231.

19. In another post, Defendant uses the "Chair Phyllis J. Randall" Facebook page to solicit participation in the "Commission on Women and Girls," an initiative Defendant created and runs in her capacity as Chair of the Loudoun County Board of Supervisors from her County office.  The post in question includes a link to an application hosted on Loudoun County's website and the telephone number of Defendant's office.  Tr. 87-88, 90-91, 205; Pl. Exh. 112.

20. Many posts document meetings of the Loudoun County Board of Supervisors.  Some discuss Board proclamations recognizing "National Public Safety Telecommunications Week," "National Hunger Awareness Month," and "Loudoun Small Business Week," among others.  Pl. Exhs. 109, 172, 195.  Another post

memorializes the Board's decision to approve funding for new equipment for Loudoun County firefighters, stating that "[m]aking sure Loudoun's first responders have the required equipment is a high priority for your County Chair."  Pl. Exh. 136.  Similarly, in another post Defendant uses her "Chair Phyllis J. Randall" Facebook page to announce that the Board has adopted a budget for fiscal year 2017.  Pl. Exh. 180.  In another post, Defendant notes the Board's formal recognition of two police officers who saved a Loudoun County man from a potentially fatal heroin overdose.  Pl. Exh. 182.

21.  Other posts on Defendant's "Chair Phyllis J. Randall" Facebook page document events outside of Board meetings that Defendant attended in her official capacity as Chair of the Loudoun County Board of Supervisors.  For example, two posts report on a conference of the National Association of Counties, at which Defendant represented the Board of Supervisors.  Tr. 144-45; Pl. Exhs. 154, 156. Another post discusses the Metro Summit in Washington, DC, at which Defendant likewise represented Loudoun County. Pl. Exh. 181.  In another post, Defendant memorializes her attendance at a groundbreaking ceremony for a road expansion project.  Pl. Exh. 150.  Defendant reports in yet another post that she is "in Richmond lobbying for our

legislative program," stating that she would report on her efforts at the next Board of Supervisors meeting.  Pl. Exh. 122.

22. Several posts on Defendant's "Chair Phyllis J. Randall" Facebook page promote and invite attendance at events related to Defendant's work as Chair.  In one such post, Defendant announces that she has asked the director of Loudoun County's Health Department to speak about the Zika virus at the next Board of Supervisors meeting.  Pl. Exh. 184.  Another post notes the schedule of public meetings to be held addressing the County's budget approval process. Pl. Exh. 186.  One post invites Defendant's constituents to attend her first "State of the County" address.  Pl. Exh. 162.  Another announces a press conference regarding road conditions after a snow storm, stating that the information discussed at the press conference would be shared on the "Chair Phyllis J. Randall" Facebook page, and asking that anyone in medical need contact Defendant.  Pl. Exh. 196. This post concludes with a personal note stating "(This is just from me)."  Pl. Exh. 196.

23. Many – perhaps most – of the posts on Defendant's "Chair Phyllis J. Randall" Facebook page are expressly addressed to "Loudoun" – Defendant's constituents.  *See, e.g.*, Pl. Exhs. 101-07, 110, 112, 116-19, 122, 124, 128.

24. Occasionally, the posts are submitted "[o]n behalf of the Loudoun County Board of Supervisors" as a whole. *See* Pl. Exhs. 132, 135, 138.

25. Defendant sometimes uses the comments section of her posts to the "Chair Phyllis J. Randall" Facebook page to engage with her constituents. In one instance, Defendant uses the comments section of a post to coordinate relief efforts after a snow storm. Pl. Exh. 196. Similarly, in the comments section of a post about Defendant's visit to Loudoun's "Sister County" in Germany, a commenter notes that her "daughter is interested in exchange programs" and Defendant offers to "help make that connection," advising the commenter to "contact [her] office in a few weeks." Pl. Exh. 106. In another post, Defendant uses the comments section to solicit questions to be asked of the head of Loudoun County's Health Department at the next Board of Supervisors meeting. Pl. Exh. 184.

26. Defendant's office regularly releases an official "Chair Phyllis J. Randall" newsletter, written largely by Defendant's executive assistant. The newsletter is hosted on the County's website and is distributed through Defendant's County mailing list. At the bottom of each newsletter are the words "STAY CONNECTED," with an image of a Facebook icon. This image links to Defendant's "Chair

Phyllis J. Randall" Facebook page, and selecting it while viewing the newsletter with an electronic device connected to the internet will cause the device to display Defendant's "Chair Phyllis J. Randall" Facebook page.  Tr. 115-17, 128; Pl. Exhs. 17-31.

27. Defendant's "Chair Phyllis J. Randall" Facebook page also includes discussion of matters of a more personal nature. Among other things, Defendant has posted to the "Chair Phyllis J. Randall" Facebook page conveying personal congratulations, documenting an afternoon shopping trip, proclaiming her affection for the German language, and announcing awards she has received outside of her governmental service.  *See* Tr. 59-63.

28. In addition to her "Chair Phyllis J. Randall" Facebook page, Defendant maintains a personal Facebook profile and another Facebook page, "Friends of Phyllis Randall." Defendant generally uses her personal profile to discuss family matters, and her "Friends of Phyllis Randall" page to discuss politics.  Ms. Arnett does not have administrative privileges with respect to these pages.  Tr. 95-96, 217-18.

29. On February 3, 2016, Defendant participated in a joint town hall discussion held by the Loudoun County Board of Supervisors and Loudoun County School Board.  The event was

hosted by the Loudoun Education Alliance of Parents (LEAP), the Minority Student Advisory Association Committee, and the Special Education Advisory Committee Organization. Tr. 21.

30. Plaintiff attended the panel discussion and anonymously submitted two questions for discussion.  Tr. 24.

31. One of Plaintiff's questions was selected for submission to the panel.  It concerned Defendant's proposal, made during her campaign, for an ethics pledge for public servants. Plaintiff asked whether School Board members – whom Plaintiff suggested had acted unethically – should be required to take such a pledge.  Tr. 24.

32. Defendant volunteered to answer the question, but characterized it as a "set-up question" that she did not "appreciate."  Defendant stated, after giving a more substantive answer, that her proposed ethics pledge was not intended as a "tool to accuse somebody or hit somebody over the head."  Tr. 25.

33. Plaintiff took issue with Defendant's answer, believing it to be inadequate.  Tr. 25-26.  Shortly after Defendant spoke, and before the end of the meeting, Plaintiff used Twitter – a popular social media website – to post a message directed at Defendant.  Tr. 27.  The message read

"@ChairRandall 'set up question'? You might want to strictly follow FOIA and the COIA as well." Pl. Exh. 3.

34. Plaintiff claims that, at this point, Defendant noticed his message and began glowering at him during the panel discussion. The Court, however, finds credible Defendant's testimony that she was not familiar with Plaintiff and could not have identified him on the night in question. Tr. 214.

35. At some point that evening, Defendant posted about the panel discussion on her "Chair Phyllis J. Randall" Facebook page. Plaintiff then commented on Defendant's post using his own Facebook page, "Virginia SGP."

36. Plaintiff does not remember the precise content of his comment – the first he can recall having left on the "Chair Phyllis J. Randall" Facebook page. Tr. 53. Defendant recalls that the comment, like Plaintiff's question at the panel discussion, included allegations of corruption on the part of Loudoun County's School Board involving conflicts of interests among the School Board and their family members. Tr. 191, 212.

37. Defendant took issue with Plaintiff's accusations regarding her "colleagues on the School Board," although Defendant admits she "had no idea" whether they were well-founded. Defendant concluded that Plaintiff's allegations were

"probably not something [she] want[ed] to leave" on her
Facebook page and chose to delete her original post,
including Plaintiff's comment.  Tr. 191.

38.  Defendant then banned Plaintiff from her "Chair Phyllis J.
Randall" Facebook page because "if [he] was the type of
person that would make comments about people's family
members, then maybe [Defendant] didn't want [him] to be
commenting on [her] site."  Tr. 29-30, 213.

39.  Based on Defendant's testimony, the Court finds that
Defendant banned Plaintiff from her Facebook page because
she was offended by his criticism of her colleagues in the
County government.

40.  When an individual is banned from a Facebook page, they can
read and share content posted on that page, but cannot
comment on or send private messages to that page.  *See* Pl.
Exh. 34.

41.  Plaintiff is the only person Defendant has ever banned from
her Facebook page.  Tr. 166.

42.  The following morning, Defendant reconsidered her decision
to ban Plaintiff from her "Chair Phyllis J. Randall"
Facebook page and unbanned him.  The period during which
Plaintiff was banned was relatively brief and spanned at
most 12 hours.  Tr. 49, 194.

13

43.     During the period he was banned from Defendant's "Chair

        Phyllis J. Randall" Facebook page, Plaintiff remained able

        to see and share content from Defendant's website.  Tr. 50-

        51.  He was also able to post "essentially the same thing

        on multiple pages" during the night in question.  Tr. 51.

        He was not, however, able to discuss the night's events on

        Defendant's Facebook page as he desired.  Tr. 54-56.

### II. Conclusions of Law

### A.    Defendant Acted Under Color of State Law.

        Defendant contends that her "Chair Phyllis J. Randall"

Facebook page is merely a personal website that she may do with

as she pleases.  This raises a novel legal question: when is a

social media account maintained by a public official considered

"governmental" in nature, and thus subject to constitutional

constraints?  The Court concluded previously that the best way

to answer this question is to examine whether the public

official acts under color of state law or undertakes state

action in maintaining the social media account.[1]  Based on the

evidence adduced at trial, the Court concludes that Defendant

acted under color of state law here, both in maintaining her

---

[1]      "The statutory color-of-law prerequisite [of § 1983]
is synonymous with the more familiar state-action requirement —
and the analysis for each is identical."  *Philips v. Pitt Cnty.
Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

14

"Chair Phyllis J. Randall" Facebook page generally, and in taking the specific action of banning Plaintiff from that page.

To state a constitutional claim, one must trace the challenged conduct to the government. *See, e.g., Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (noting that the constitution does not reach "'merely private conduct, no matter how discriminatory or wrongful'") (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1002 (1982)). As relevant here, state action occurs where "apparently private actions . . . have a 'sufficiently close nexus' with the State to be 'fairly treated as'" the actions of "'the State itself.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). What constitutes a sufficient nexus is largely "'a matter of normative judgment,'" *id.* at 523 (quoting *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)), and the Fourth Circuit has "recognized that there is 'no specific formula' for" making this determination. *Holly v. Scott*, 434 F.3d 287, 292 (4th Cir. 2006) (quoting *Hicks v. S. Md. Health Sys. Agency*, 737 F.2d 399, 402 n.3 (4th Cir. 1984). Rather, Courts look to the "totality of circumstances." *Rossignol*, 316 F.3d at 527 n.1.

Turning to the facts of this case, there are some indications that Defendant's "Chair Phyllis J. Randall" Facebook page is entirely private. Defendant's enumerated duties do not include the maintenance of a social media website. The website

in question will not revert to the County when Defendant leaves office.  Moreover, Defendant does not use county-issued electronic devices to post to the "Chair Phyllis J. Randall" Facebook page, and much of Defendant's social media activity takes place outside of both her office and normal working hours. But while these are considerations for the Court to weigh, they are not dispositive.

The Court finds *Rossignol v. Voorhaar*, 316 F.3d 516 (4th Cir. 2003) instructive in this regard.  In *Rossignol*, a newspaper regularly criticized the conduct and leadership of a local sheriff's office.  Anticipating criticism of the sheriff in the paper's election day issue, off-duty law enforcement officers went from vendor to vendor the night before the election and bought all available issues, effectively taking the paper out of circulation.  *See id.* at 519-20.  When the paper sued on First Amendment grounds, the district court held that because the officers were off the clock and not acting pursuant to their official duties, they were not acting under color of state law.  *See id.* at 522-23.

The Fourth Circuit reversed, holding that the officers' actions possessed the "requisite nexus" with their "public office" to be fairly attributable to the government. *Id.* at 523.  Among other things, the Fourth Circuit found it significant that the defendants' public office provided the

16

impetus for their actions, and thus those actions "arose out of public, not personal, circumstances." *Id.* at 524.  Moreover, the defendants' "identities as state officers played a role" in their scheme insofar as their actions were facilitated by their apparent authority.  *Id.* at 526.  Thus the fact that the officers acted beyond the scope of their duties in their own free time did not insulate them from constitutional claims.  *See also Givens v. O'Quinn*, 121 F. App'x 984, 985 (4th Cir. 2005) (per curiam) (finding that correctional officers who acted outside of the scope of their official duties in "hazing" a coworker still acted under color of state law); *United States v. Causey*, 185 F.3d 407, 415 (5th Cir. 1999) (concluding that an off-duty police officer had acted under color of state law in conspiring with a drug dealer to murder a woman who filed an administrative complaint against him); *Layne v. Sampley*, 627 F.2d 12, 13 (6th Cir. 1980) (finding that an off-duty police officer acted under color of state law in shooting an individual with whom he had a dispute arising out of his police work).

As in *Rossignol*, Defendant's actions here "arose out of public, not personal, circumstances."  316 F.3d at 524.  The impetus for Defendant's creation of the "Chair Phyllis J. Randall" Facebook page was, self-evidently, Defendant's election to public office.  She created the page in collaboration with her Chief of Staff the day before she took office, and did so

17

for the purpose of addressing her new constituents.  *See* Tr.
133, 176.  Defendant then posted to her "Friends of Phyllis
Randall" Facebook page, which she had employed during her
campaign, and asked that her supporters "visit [her] County
Facebook Page[,] Chair Phyllis J. Randall."  Pl. Exh. 221.  The
"Chair Phyllis J. Randall" Facebook page was born out of, and is
inextricably linked to, the fact of Defendant's public office.

Moreover, since creating the "Chair Phyllis J.
Randall" Facebook page, Defendant has used it as a tool of
governance.  The page is, for example, one of two preferred
means by which Defendant holds "back and forth constituent
conversations."  Pl. Exhs. 201, 231.  In that capacity the
"Chair Phyllis J. Randall" Facebook page has, among other
things, facilitated Defendant's coordination of disaster relief
efforts after a storm, *see* Pl. Exh. 196, and Defendant's efforts
to aid a constituent's daughter seeking to study abroad.  Pl.
Exh. 106.  Defendant has further used the page to solicit
participation in the "Commission on Women and Girls" – an
initiative Defendant runs out of her office, Tr. 87-88, 90-91,
205; Pl. Exh. 112 – and to promote and invite attendance at
events related to her work as Chair.  *See, e.g.*, Pl. Exhs. 162,
184, 186, 196.  And, most frequently, Defendant has used the
page to keep her constituents abreast of her activities as Chair

18

and of important events in local government.  *See, e.g.*, Pl.

Exhs. 109, 122, 136, 150, 154, 156, 172, 180-82, 195.

The Court notes as well that Defendant has used County

resources to support the "Chair Phyllis J. Randall" Facebook

page.  Most notably, Defendant's Chief of Staff helped to create

the page and continues to assist in its maintenance.  *See, e.g.*,

Tr. 85, 109, 110-11, 133, 176, 180, 191; Pl. Exh. 93.  Defendant

attempts to downplay the significance of this fact by pointing

out that she and Ms. Arnett share a personal friendship separate

and apart from their professional relationship.  That

friendship, however, does not change the fact that Ms. Arnett is

a salaried employee of the County, whose duties entail generally

"support[ing] the Office of Chair."  Tr. 181.  The Court rejects

Defendant's insinuation that Ms. Arnett helps Defendant maintain

the "Chair Phyllis J. Randall" Facebook page solely due to their

friendship.  It is not a coincidence that the friend Defendant

chose to help her maintain the "Chair Phyllis J. Randall"

Facebook page *just happens* to be her Chief of Staff.

In addition to Ms. Arnett's contributions, official

newsletters released by Defendant's office have generally

included links promoting Defendant's "Chair Phyllis J. Randall"

Facebook page.  *See* Tr. 115-17, 128; Pl. Exhs. 17-31.  These

newsletters were drafted by a County employee, are hosted in PDF

format on the County's website, and have been disseminated

through a mailing list provided to Defendant by the County.  *See* Tr. 115-17, 128.[2]

Also weighing in favor of finding state action here are Defendant's efforts to swathe the "Chair Phyllis J. Randall" Facebook page in the trappings of her office.  Among other things, (1) the title of the page includes Defendant's title; (2) the page is categorized as that of a government official; (3) the page lists as contact information Defendant's official County email address and the telephone number of Defendant's County office; (4) the page includes the web address of Defendant's official County website; (5) many – perhaps most – of the posts are expressly addressed to "Loudoun," Defendant's constituents; (6) Defendant has submitted posts on behalf of the Loudoun County Board of Supervisors as a whole; (7) Defendant has asked her constituents to use the page as a channel for "back and forth constituent conversations"; and (8) the content posted has a strong tendency toward matters related to

---

[2]      The Court notes that, at trial, Defendant expressed surprise that the Facebook icon at the bottom of her office's newsletter links to her "Chair Phyllis J. Randall" Facebook page.  Given that Defendant has personally approved a large number of such newsletters, it is unclear how she could be unaware of this fact.  Whether or not Defendant directed her staff to include the link, however, it was undoubtedly included because Defendant has consistently treated the "Chair Phyllis J. Randall" Facebook page as a website associated with her public office, to the extent that those working for her understand that to be the case.  It is therefore still ultimately Defendant who has caused the County to expend resources to promote her Facebook page.

Defendant's office.  *See, e.g.*, Tr. 129-31; Pl. Exhs. 101-07, 110, 112, 116-19, 122, 124, 128, 132, 135, 138, 201, 231.  Given this consistent messaging, and notwithstanding Defendant's occasional posts regarding more personal matters,[3] Defendant has operated the "Chair Phyllis J. Randall" Facebook page while "purporting to act under the authority vested in [her] by the state."  *Hughes v. Halifax Cnty. Sch. Bd.*, 855 F.2d 183, 186-87 (4th Cir. 1988).

Finally, assuming the specific act of banning Plaintiff from the "Chair Phyllis J. Randall" Facebook page can be analyzed separately, this likewise "arose out of public, not personal, circumstances."  *Rossignol*, 316 F.3d at 524.  Plaintiff's comment regarding alleged misconduct by County officials was obviously related to a question Defendant had fielded at a town hall earlier that evening.  Defendant banned Plaintiff from her Facebook page due to this criticism of her "colleagues" in the County government.  *See* Tr. 29-30, 191, 213.  As in *Rossignol*, Defendant acted out of "censorial motivation"

---

[3]     While Defendant testified at trial that she frequently posts on personal topics unrelated to her work as Chair of the Loudoun County Board of Supervisors, the extensive record before the Court includes roughly 100 exhibits depicting Defendant's posts to the "Chair Phyllis J. Randall" Facebook page, nearly all of which relate directly or indirectly to Defendant's public office.  There is comparably little evidence of posts of a more personal nature.

to suppress criticism of county officials related to the "conduct of their official duties."   316 F.3d at 523.

In light of the above, the Court finds that the "totality of circumstances," *Rossignol*, 316 F.3d at 527 n.1, demonstrates that Defendant acted under color of state law in maintaining her "Chair Phyllis J. Randall" Facebook page and in banning Plaintiff from that page.

### B. Defendant Violated Plaintiff's Right of Free Speech under the United States and Virginia Constitutions.

Plaintiff brings claims against Defendant both under the First Amendment to the United States Constitution and Article I, § 12 of the Virginia Constitution – the First Amendment's Virginia analogue.  The Court analyzes these claims together, as "[t]he Supreme Court of Virginia has held that 'Article I, § 12 of the Constitution of Virginia is coextensive with the free speech provisions of the federal First Amendment.'"  *Willis v. City of Virginia Beach*, 90 F. Supp. 3d 597, 607 (E.D. Va. 2015) (quoting *Elliott v. Commonwealth*, 267 Va. 464, 473-74 (2004)).

As an initial matter, Plaintiff brings suit against Defendant in both her official and individual capacities.  Where an official capacity claim is concerned, the claim is not truly against the individual, but against the governmental entity she represents.  *See Monell v. Dep't of Soc. Servs. of City of N.Y.*,

436 U.S. 658, 691 n.55 (1978).  Moreover, a "governmental entity is liable under § 1983" in an official capacity claim "only when the entity itself is a moving force behind the deprivation," and the entity's "policy or custom must have played a part in the violation of federal law."  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (citations omitted).  The Court notes that "[t]here is no . . . need to bring official-capacity actions against local government officials" like Defendant "for . . . local government units can be sued directly for damages and injunctive or declaratory relief" under § 1983.  *Id.* at 170 n.14.

As discussed in the Court's previous Memorandum Opinion [Dkt. 116], Defendant operates the "Chair Phyllis J. Randall" Facebook page outside of any County policy.  The evidence adduced at trial confirmed that no policy – whether County-wide or specific to Defendant's office – played any role in Defendant's decision to ban Plaintiff from her "Chair Phyllis J. Randall" Facebook page.  Rather, Defendant made a unilateral decision to ban Plaintiff in the heat of the moment, and reconsidered soon thereafter.  *See* Tr. 191, 212-13.

At trial, Plaintiff appeared to argue that there existed an informal County custom and policy insofar as "the Board of Supervisors [was] aware [of] and condoned [Defendant's] action."  Tr. 7.  The Court construes this as an argument that the Board ratified Defendant's decision and thus may itself be

held liable. This doctrine, however, applies only where a superior affirmatively approves and adopts its subordinate's action and her rationale for that action. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."). The Board is not Defendant's superior in any relevant sense and has no formal authority to approve or disapprove anything Defendant may do on her "Chair Phyllis J. Randall" Facebook page. And even if the Board possessed the power to sanction Defendant for her actions in some way, failing to do so was not the same as approving and adopting Defendant's actions. *See, e.g.*, *Ashby v. Isle of Wight Cnty. Sch. Bd.*, 354 F. Supp. 2d 616, 627 (E.D. Va. 2004) ("There must be some approval of the act, not just refusal to overrule the act."). Plaintiff's free speech claims against Defendant in her official capacity therefore fail.

That, however, still leaves Plaintiff's claims against Defendant in her individual capacity. Accordingly, the Court proceeds to analyze Defendant's free speech claims against Defendant Randall herself. Having found that Defendant operates her "Chair Phyllis J. Randall" Facebook page under color of state law, the Court concludes that her decision to ban

24

Plaintiff from that page violated Plaintiff's rights under the U.S. and Virginia Constitutions.

The Court first must determine whether this case concerns speech protected by the First Amendment. *See Am. Civil Liberties Union v. Mote*, 423 F.3d 438, 442 (4th Cir. 2005). Here, that task is complicated by the fact that neither party recalls the precise content of the comment that prompted Defendant to ban Plaintiff from her "Chair Phyllis J. Randall" Facebook page. *See* Tr. 53, 191, 212. Nonetheless, it is clear from both the context in which Plaintiff made the comment and what the parties recall of it that Plaintiff's comment raised ethical questions about the conduct of School Board officials, alleging conflicts of interest involving their family members. *See* Tr. 53, 191, 212. Such "criticism of . . . official conduct" is not just protected speech, but lies at the very "heart" of the First Amendment. *Rossignol*, 316 F.3d at 522.

The Court must next determine whether Defendant opened a forum for speech by creating her "Chair Phyllis J. Randall" Facebook page. *See Mote*, 423 F.3d at 443. The Fourth Circuit has suggested that the government may open a forum for speech by creating a website that includes a "'chat room' or 'bulletin board' in which private viewers could express opinions or post information," or that otherwise "invite[s] or allow[s] private persons to publish information or their positions." *Page v.*

*Lexington Cnty. Sch. Dist. One*, 531 F.3d 275, 284 (4th Cir. 2008). Defendant's "Chair Phyllis J. Randall" Facebook page is such a website.

When one creates a Facebook page, one generally opens a digital space for the exchange of ideas and information. *See* Pl. Exh. 34 (noting that Facebook pages are designed to be "public spaces"); *see also Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017) (comparing social media to traditional public fora such as parks and streets). Defendant did so here, deliberately permitting public comment on her "Chair Phyllis J. Randall" Facebook page. Tr. 162. In practice, Defendant has allowed virtually unfettered discussion on that page. Tr. 164-66. Indeed, Defendant has affirmatively solicited comments from her constituents:

> Everyone, could you do me a favor. I really want to hear from ANY Loudoun citizen on ANY issues, request, criticism, compliment, or just your thoughts. However, I really try to keep back and forth conversations (as opposed to one time information items such as road closures) on my county Facebook page (Chair Phyllis J. Randall) or County email (Phllis.randall@loudoun.gov). Having back and forth constituent conversations are Foiable (FOIA) so if you could reach out to me on these mediums that would be appreciated. Thanks much, Phyllis

Pl. Exhs. 201, 231.[4]  This sort of governmental "designation of a place or channel of communication for use by the public" is more than sufficient to create a forum for speech.  *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985).

At this point in the analysis, the Court would ordinarily endeavor to determine the precise "nature of the forum" at issue – whether it is a traditional, limited, or non-public forum.  *Mote*, 423 F.3d at 443.  The Court, however, need not pass on the issue, as the record demonstrates that Defendant engaged in viewpoint discrimination by banning Plaintiff from her Facebook page.  Viewpoint discrimination is "prohibited in all forums."  *Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*, 470 F.3d 1062, 1067 n.2 (4th Cir. 2006).

Defendant has adopted no policy with respect to her "Chair Phyllis J. Randall" Facebook page that serves to limit the types of comments permitted.  The closest Defendant has come to promulgating such a policy is her statement that she "really want[s] to hear from ANY Loudoun citizen on ANY issue[ ] . . . on [her] county Facebook page (Chair Phyllis J. Randall)."  Pl. Exhs. 201, 231.  Defendant generally does not moderate comments except those that contain profanity, and Plaintiff remains the

---

[4]     The Court notes that Defendant posted this comment several months after the incident giving rise to this suit.  The phrase "I really try to keep back and forth conversations . . . on my county Facebook page," however, clearly describes a past and present practice rather than a change of policy.

only person Defendant has ever banned from her "Chair Phyllis J. Randall" Facebook page.  Tr. 164-66.  In short, Defendant did not ban Plaintiff pursuant to any neutral policy or practice that she has applied in an evenhanded manner.  Rather, from Defendant's testimony, it is apparent that Defendant banned Plaintiff from the "Chair Phyllis J. Randall" Facebook page because she was offended by his criticism of her "colleagues on the School Board":

> Q. And what did that post consist of?
>
> A. A lot of talking about the School Board members, and it was a lot of accusations about – what I considered accusations – about the School Board members. I didn't know those statements to be true or not true. And they were not germane to the post. But mostly, because they were accusations that I didn't know to be true and I thought they were fairly personal in nature. And so, I didn't want them on the site.
>
> Q. What kind of accusations?
>
> A. Accusations about their spouses and that maybe there was – things like we should all ask the question, or is there money being taken or given. Those kinds of things. Just accusations about who I consider my colleagues on the School Board. I had no idea if any of that was correct, and I also feel that if you pose a question that says, "We should ask if somebody is taking kickback money," then that's probably not something I want to leave on my –
>
> Q. Were these accusations from which you inferred criminal activity or

> allegations were being made against
> individuals who are identified?
>
> A.  I don't know if I would say
> "criminal."  In my opinion, they were
> slanderous.

Tr. 190-91.  Defendant then "decided at that moment that if

[Plaintiff] were a type of person that would make comments about

people's family members, then maybe [Defendant] didn't want

[Plaintiff] to be commenting on [her] site."  Tr. 213.

If the Supreme Court's First Amendment jurisprudence

makes anything clear, it is that speech may not be disfavored by

the government simply because it offends.  *See Matal v. Tam*, 137

S. Ct. 1744, 1763 (2017) (listing cases).  Here, as discussed

above, Defendant acted in her governmental capacity.

Defendant's offense at Plaintiff's views was therefore an

illegitimate basis for her actions – particularly given that

Plaintiff earned Defendant's ire by criticizing the County

government.  Indeed, the suppression of critical commentary

regarding elected officials is the quintessential form of

viewpoint discrimination against which the First Amendment

guards.  *See Rossignol*, 316 F.3d at 521–22.  By prohibiting

Plaintiff from participating in her online forum because she

took offense at his claim that her colleagues in the County

government had acted unethically, Defendant committed a cardinal sin under the First Amendment.[5]

Practically speaking, the consequences of Defendant's actions were fairly minor. The ban lasted a matter of hours, spanning only a single night. During that time, Plaintiff was able to post "essentially the same thing on multiple pages." Tr. 51. There is little indication that Plaintiff's message was suppressed in any meaningful sense, or that he was unable to reach his desired audience.

As the Supreme Court has recently noted, however, social media – and Facebook in particular – has become a vital platform for speech of all kinds. *See Packingham*, 137 S. Ct. at 1735-36. Indeed, social media may now be "the most important"

---

[5] At various times throughout this litigation, Defendant has attempted to excuse her decision to ban Plaintiff from her "Chair Phyllis J. Randall" Facebook page by claiming that his comment was "off topic." This appears to be a reference to the Loudoun County Social Media Comments Policy, which permits the removal of comments deemed to be "off topic." Defendant, however, has successfully argued that her Facebook page is not governed by the County's policy. See Mem. Op. [Dkt. 116]. It is therefore unclear why Defendant believes she may shelter her actions under that policy, particularly given her own contrary statement on her Facebook page that she "really want[s] to hear from ANY Loudoun citizen on ANY issue[ ] . . . on [her] county Facebook page (Chair Phyllis J. Randall)." Pl. Exhs. 201, 231. The Court notes as well that Defendant has deemed many of Plaintiff's comments on her Facebook page to be "off topic," but only banned him when he criticized her colleagues in the County government. *See* Tr. 164. Regardless, Plaintiff's comment apparently concerned a question Defendant had fielded at the town hall earlier that night, and the post on which he left it likewise concerned that town hall.

modern forum "for the exchange of views."  *Id.* at 1735.  The
First Amendment applies to speech on social media with no less
force than in other types of forums.  *See, e.g.*, *Bland v.
Roberts*, 730 F.3d 368, 386 n.14 (4th Cir. 2013), *as amended*
(Sept. 23, 2013).  The Court cannot treat a First Amendment
violation in this vital, developing forum differently than it
would elsewhere simply because technology has made it easier to
find alternative channels through which to disseminate one's
message.  Moreover, as made clear by another recent Supreme
Court opinion, the government violates the First Amendment by
disfavoring "offensive" speech in ways far milder than outright
suppression.  *See Matal*, 137 S. Ct. at 1753, 1765 (holding that
the bar to federal registration of "disparaging" trademarks
violates the First Amendment, notwithstanding the availability
of many trademark benefits without federal registration).

All of this isn't to say that public officials are
forbidden to moderate comments on their social media websites,
or that it will always violate the First Amendment to ban or
block commenters from such websites.  Indeed, a degree of
moderation is necessary to preserve social media websites as
useful forums for the exchange of ideas.  Neutral, comprehensive
social media policies like that maintained by Loudoun County –
and eschewed by Defendant here – may provide vital guidance for
public officials and commenters alike in navigating the First

31

Amendment pitfalls of this "protean" and "revolution[ary],"
*Packingham*, 137 S. Ct. at 1736, forum for speech.  The Court
holds only that under the specific circumstances presented here,
Defendant violated the First Amendment by engaging in viewpoint
discrimination and banning Plaintiff from a digital forum for
criticizing her colleagues in the County government.

### C. Defendant Did Not Violate Plaintiff's Right of Due Process under the United States and Virginia Constitutions.

Plaintiff contends that Defendant violated his right
to procedural due process under the Fourteenth Amendment to the
United States Constitution and Article I, § 11 of the
Constitution of Virginia.  The Court again analyzes Plaintiff's
state and federal claims together, as "the due process
protections afforded under the Constitution of Virginia are co-
extensive with those of the federal constitution," and so "the
same analysis will apply to both."  *Shivaee v. Commonwealth of
Virginia*, 270 Va. 112, 119 (2005).

As an initial matter, the Court notes that Plaintiff's
legal theory is somewhat unclear.  Plaintiff offered virtually
no evidence or argument on the due process issue.  Instead, he
flatly asserted that due process *always* requires the government
to provide a hearing before imposing a prior restraint on
speech, and pointed out that he received no such hearing here.

While Plaintiff is correct that "[w]hen a State would directly impinge upon interests in free speech or free press, [the Supreme] Court has on occasion held that opportunity for a fair adversary hearing must precede the action," *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 575 (1972), Plaintiff is mistaken that such a hearing is always required. "'[D]ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.'" *Cafeteria & Rest. Workers Union, Local 473, AFL-CIO v. McElroy*, 367 U.S. 886, 895 (1961) (quoting *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 162—163 (1951) (Black, J., concurring)). Rather, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). The fact that the Supreme Court has held that a predeprivation hearing was required where, for example, government officials obtained an injunction forbidding a political rally, *see Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 181 (1968), does not mean that such a hearing was required here, where a public official banned a single individual from a Facebook page for a period of 12 hours.

Compounding the Court's difficulties is the fact that this case is a relatively awkward fit for the analytical framework of due process. Where due process is concerned, "the

33

Supreme Court has distinguished between (a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees." *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 880 (2d Cir. 1996). Here, Defendant's actions, although taken under color of state law, were not based on established County procedures or powers delegated to her by the County. On the other hand, Defendant is no mere "state employee," but rather is an elected official who answers only to her constituents.[6]

The result, however, is the same under either rubric.

Where a rogue state actor deprives an individual of a constitutionally protected interest, due process is satisfied so long as "a meaningful postdeprivation remedy for the loss is

---

[6]     Some courts have held that the actions of high ranking government officials are never "unauthorized" for purposes of due process. *See DiBlasio v. Novello*, 344 F.3d 292, 302-03 (2d Cir. 2003). The Fourth Circuit reached the opposite conclusion in *Fields v. Durham*, 856 F.2d 655, 658 (4th Cir. 1988), *cert. granted, judgment vacated*, 494 U.S. 1013 (1990). *See id.* ("We agree with the Fifth Circuit that . . . isolated instances of misconduct become no less random or unauthorized simply because they were taken by high ranking officials."). The Supreme Court, however, vacated the Fourth Circuit's judgment, and the Fourth Circuit reconsidered its earlier holding on remand. *See Plumer v. State of Md.*, 915 F.2d 927, 930 n.3 (4th Cir. 1990) (discussing the difference between the Fourth Circuit's holdings in *Fields I* and *Fields II*). The Fourth Circuit has subsequently taken a "narrow" view of what constitutes an unauthorized action for purposes of due process, *Bogart v. Chapell*, 396 F.3d 548, 565 (4th Cir. 2005) (Williams, J., dissenting) (discussing the development of the Fourth Circuit's jurisprudence), but it does not appear to have gone so far as to hold that the actions of a high ranking official may *never* be unauthorized.

available." *Hudson v. Palmer*, 468 U.S. 517, 533 (1984).  No predeprivation hearing is constitutionally required – or even feasible – in such situations.

That appears to be the case here.  As discussed above, this case concerns "apparently private actions" that "have a 'sufficiently close nexus' with the State to be 'fairly treated as'" the actions of "'the State itself.'"  *Rossignol*, 316 F.3d at 523.  Defendant acted outside of County policies without reference to any particular power delegated to her by the County.  Generally, where officials act outside the scope of the authority expressly vested in them by the state, their actions are "unauthorized" for purposes of due process.  *See Bogart v. Chapell*, 396 F.3d 548, 563 (4th Cir. 2005).  Moreover, it's not clear that the County could or should have anticipated that Defendant would take a private social media account – which, as Plaintiff acknowledges, County officials may freely maintain – and make use of it in a manner that would render it governmental in nature.  *See id.* at 561 (noting that predeprivation process is generally not required where the action at issue is "unforeseeable").  Finally, it does not appear that predeprivation process is feasible on a systematic level in this context.  See *id.* (noting that predeprivation process is not constitutionally required when impracticable).  The only way to provide such process would be to require that County officials

and employees treat all social media accounts they maintain as governmental in nature, and thus subject to constitutional limitations.  That, however, would unduly burden the speech of County officials and employees, and could in fact violate their First Amendment rights.  *See, e.g.*, *Packingham*, 137 S. Ct. at 1736 (holding unconstitutional a law deemed to unduly restrict social media usage*); Liverman v. City of Petersburg*, 844 F.3d 400, 411 (4th Cir. 2016) (discussing the First Amendment right of public employees with respect to social media usage).

Assuming this case does not fit the *Hudson* mold, the Court must undertake a more searching inquiry, evaluating "(1) the nature of 'the private interest that will be affected,' (2) the comparative 'risk' of an 'erroneous deprivation' of that interest with and without 'additional or substitute procedural safeguards,' and (3) the nature and magnitude of any countervailing interest in not providing 'additional or substitute procedural requirement[s].'"  *Turner v. Rogers*, 564 U.S. 431, 444–45 (2011) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Here, while Plaintiff has a cognizable First Amendment interest in commenting upon Defendant's "Chair Phyllis J. Randall" Facebook page, that interest is relatively weak.  As discussed above, Plaintiff failed to demonstrate that being banned from the "Chair Phyllis J. Randall" Facebook page

36

meaningfully curtailed his speech.  Rather, Plaintiff testified that he was able to post "essentially the same thing on multiple pages" during the night in question.  Tr. 51.  As this Court recently observed in a similar case, being banned from a particular Facebook page imposes a relatively inconsequential burden on one's First Amendment rights from a practical standpoint.  *See Davison v. Plowman*, No. 1:16CV180 (JCC/IDD), 2017 WL 1164480, at *7 (E.D. Va. Mar. 28, 2017).  And while that might not have been relevant to the Court's First Amendment analysis – a practically trivial First Amendment violation is a violation nonetheless – "the degree of potential deprivation that may be created by a particular decision is a factor to be considered in" analyzing a procedural due process claim. *Mathews*, 424 U.S. at 341.  Here, the degree of the potential deprivation is quite small.

Moreover, Plaintiff adduced no evidence at trial demonstrating that there would be any substantial benefit to predeprivation procedures in this context.  Indeed, Plaintiff could not articulate what such procedures would entail besides "notice that a comment is . . . targeted and under review."  Tr. 240.[7]  It is unclear what might be relevant to a government

---

[7]      The Court is somewhat puzzled by this suggestion, given that Plaintiff does not here challenge the removal of a comment from Defendant's Facebook page, but rather Defendant's decision to ban him from that page.

official's decision to ban an individual from their Facebook page besides that individual's activity on the Facebook page in question.  That activity is apparent without predeprivation procedures.  It is simply not clear how predeprivation procedures might meaningfully reduce the risk of erroneous deprivation.

Finally, government officials have at least a reasonably strong interest in moderating discussion on their Facebook pages in an expeditious manner.  By permitting a commenter to repeatedly post inappropriate content pending a review process, a government official could easily fail to preserve their online forum for its intended purpose.  *Cf. Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 281 (3d Cir. 2004) ("Indeed, for the presiding officer of a public meeting to allow a speaker to try to hijack the proceedings, or to filibuster them, would impinge on the First Amendment rights of other would-be participants.").  Given the prevalence of online "trolls," this is no mere hypothetical risk.  *See, e.g.*, Matt Borden, *Covering Your Digital Assets: Why the Stored Communications Act Stands in the Way of Digital Inheritance*, 75 Ohio St. L.J. 405, 446 n.208 (2014) ("Trolls have become especially prevalent in the age of social media and have gone to the extent of harassing the families of deceased social media users.").  In light of the above, predeprivation procedures in

this context may be impracticable, and could spell the end of social media websites like the "Chair Phyllis J. Randall" Facebook page as tools of civic discourse.

Given (1) the relatively weak First Amendment interest at issue, (2) the uselessness of any predeprivation procedures in this context, and (3) the degree to which imposing predeprivation procedures here would impinge on the government's legitimate interest, the Court concludes that Plaintiff was not entitled to any form of predeprivation hearing before being banned from Plaintiff' "Chair Phyllis J. Randall" Facebook page.

That leaves the question of whether post-deprivation processes available to Plaintiff here were constitutionally adequate.  Those processes included, for example, claims brought in Virginia state court under the state constitution, *see Burch v. NC Dep't of Pub. Safety*, 158 F. Supp. 3d 449, 459 (E.D.N.C. 2016), *Fields v. Durham*, 909 F.2d 94, 99 (4th Cir. 1990), and Plaintiff's opportunity to directly petition Defendant to restore his access to the "Chair Phyllis J. Randall" Facebook page.  Plaintiff, however, failed to adduce any evidence or make any argument regarding the adequacy of available postdeprivation process.

Plaintiff bore the burden of demonstrating that any postdeprivation process here was constitutionally inadequate. *See Tri Cnty. Paving, Inc. v. Ashe Cty.*, 281 F.3d 430, 441 (4th

Cir. 2002).  While the Court has, in light of Plaintiff's *pro se* status, evaluated Plaintiff's claim that he was entitled to predeprivation procedures under the correct analytical framework despite Plaintiff's failure to do so himself, to go further would be to improperly act as Plaintiff's attorney.  As Plaintiff failed to even allege that available postdeprivation remedies were inadequate, Plaintiff failed to carry his burden and his due process claims fail.  *See Leavell v. Illinois Dep't of Nat. Res.*, 600 F.3d 798, 806 (7th Cir. 2010).

The Court notes as well that where postdeprivation remedies are all that due process requires, any constitutional violation "is not complete until and unless [the government] provides or refuses to provide a suitable postdeprivation remedy." *Hudson*, 468 U.S. at 533.  Here, Defendant "literally banned [Plaintiff] before [she] went to bed," then "woke up the next morning and . . . unbanned him." Tr. 194.  The period during which Plaintiff was banned from Defendant's Facebook page was of such a limited duration that neither Defendant nor the County government had an opportunity to provide any postdeprivation process.  Given the exceedingly short time Plaintiff was banned from Defendant's Facebook page, it does not appear that according him any postdeprivation procedure would have been practicable.  The best that Plaintiff can argue is that, had the ban continued for more than a few hours, he *would*

*have been* deprived of due process, not that he actually suffered any such deprivation.

Given the above, Defendant is entitled to judgment on Plaintiff's due process claims.

### D. An injunction is not warranted, but a declaratory judgment is.

Plaintiff requests both injunctive and declaratory relief.  With respect to Plaintiff's successful free speech claims, the Court finds that the former relief would be inappropriate while the latter should issue.

As an initial matter, it is not clear what precisely Plaintiff seeks in the way of injunctive relief.  Plaintiff's access to Defendant's "Chair Phyllis J. Randall" Facebook page was restored long before Plaintiff commenced this action.  Since that time, Plaintiff has enjoyed uninterrupted use of Defendant's Facebook page.  So far as the Court can tell, Plaintiff seeks an injunction simply requiring that Defendant henceforth follow the law.  *See* Tr. 239.  But as the Court has previously noted in another case brought by Plaintiff, "injunctions that simply require their subjects to follow the law are generally overbroad." *Davison v. Plowman*, No. 1:16CV180 (JCC/IDD), 2017 WL 1164480, at *10 (E.D. Va. Mar. 28, 2017) (citing *Lineback v. Spurlino* Materials, LLC, 546 F.3d 491, 504 (7th Cir. 2008)).  The Court can think of no administrable

41

formulation for such an injunction.  Moreover, given the

"protean" nature of the internet as a platform for speech,

*Packingham*, 137 S. Ct. at 1736, entering an injunction here

would expose Defendant to a significant yet unpredictable degree

of liability with relatively little corresponding benefit for

Plaintiff.

"[T]he decision whether to grant or deny injunctive

relief rests within the equitable discretion of the" Court.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006).  In

light of the above, the Court finds that "considering the

balance of hardships between the plaintiff and defendant," *id.*

at 391, no injunction should issue here.

Plaintiff's request for a declaratory judgment, on the

other hand, is viable.  The Declaratory Judgement Act provides

that federal courts "may declare the rights and other legal

relations of any interested party."  28 U.S.C. § 2201.  The Act

is intended to permit an "uncertain party to gain relief from

the insecurity caused by a potential suit waiting in the wings."

*United Capitol Ins. Co. v. Kapiloff*, 155 F.3d 488, 494 (4th Cir.

1998). "The Fourth Circuit has explained that a declaratory

judgment action is appropriate 'when the judgment will serve a

useful purpose in clarifying and settling the legal relations in

issue, and . . . when it will terminate and afford relief from

the uncertainty, insecurity, and controversy giving rise to the

42

proceeding.'" *Centennial Life Ins. Co. v. Poston*, 88 F.3d 255, 256 (4th Cir. 1996) (quoting *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir. 1937)).  In short, "declaratory judgments are designed to declare rights so that parties can conform their conduct to avoid future litigation." *Hipage Co. v. Access2Go, Inc.*, 589 F. Supp. 2d 602, 615 (E.D. Va. 2008) (citing *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 593-94 (4th Cir. 2004)).

Here, Plaintiff continues to avail himself of the "Chair Phyllis J. Randall" Facebook page.  Defendant maintains that she is permitted to administer this Facebook page as a purely personal page, whereas Plaintiff correctly contends that he enjoys a First Amendment right to its use.  This uncertainty regarding the legal status of Defendant's "Chair Phyllis J. Randall" Facebook page may appropriately be resolved through the issuance of a declaratory judgment.  Accordingly, the Court will find and declare that (1) Defendant acts under color of state law in maintaining her "Chair Phyllis J. Randall" Facebook page as it is presently constituted, (2) Defendant's "Chair Phyllis J. Randall" Facebook page, as presently constituted, operates as a forum for speech, and (3) engaging in viewpoint discrimination in the administration of that forum violates the First Amendment to the United States Constitution and Article I, § 12 of the Virginia Constitution.  Defendant, of course, remains free to

adopt new policies for the "Chair Phyllis J. Randall" Facebook page or to disallow comments altogether as she so chooses.

### III. Conclusion

For the foregoing reasons, the Court concludes that (1) Defendant acted under color of state law in maintaining her "Chair Phyllis J. Randall" Facebook page and banning Plaintiff from that page; (2) Defendant's actions violated Plaintiff's right of free speech under the First Amendment to the United States Constitution and Article I, § 12 of the Constitution of Virginia; (3) Defendant did not violate Plaintiff's due process rights under the Fourteenth Amendment to the United States Constitution or Article I, § 11 of the Constitution of Virginia; (4) injunctive relief is not warranted; but (5) a declaratory judgment is appropriate under the circumstances.

An appropriate Order will issue.

/s/

July 25, 2017                      James C. Cacheris
Alexandria, Virginia        UNITED STATES DISTRICT COURT JUDGE